Filed 5/22/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>OMAR HERRERA,<br><br>        Defendant and Appellant. | A165248<br><br>(San Francisco City and County<br>Super. Ct. No. CT20004050) |

Defendant Omar Herrera was charged with murder, attempted robbery, and other crimes after he shot and killed Manuel Sac Ajtzalam. Surveillance footage showed that seconds before the shooting, 19-year-old Herrera and a juvenile, A.M., approached Sac Ajtzalam and a sex worker with whom he was talking. Although Herrera was present when A.M. stole an iPhone from someone else earlier that day, he testified that he did not know A.M. intended to rob Sac Ajtzalam, did not wish to participate in any robbery, and fired at the ground only after Sac Ajtzalam made threatening movements. The jury rejected Herrera's version of events and convicted him of first degree murder and the other charges. The trial court reduced the murder conviction to second degree murder and sentenced him to 15 years to life in prison.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A.–E. and H.–I.

1

On appeal, Herrera claims that (1) insufficient evidence supports the murder and attempted-robbery convictions; (2) evidence of the iPhone theft was inadmissible; (3) a statement by the victim of the iPhone theft should have been excluded under the confrontation clause; (4) evidence from his cell phone should not have been admitted after initially being suppressed; (5) the trial court's responses to two juror questions were inadequate; (6) the jury committed misconduct by manipulating the surveillance videos during deliberations; (7) jurors committed misconduct by considering punishment and vote-swapping; (8) cumulative error requires reversal of the murder and attempted-robbery convictions; and (9) his conviction for unlawfully possessing a firearm violates the Second Amendment. In the published portion of this opinion, we reject Herrera's two claims of jury misconduct. His remaining claims also lack merit, and we therefore affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A. *The Shooting*

The shooting occurred the night of March 18, 2020, on 21st Street in San Francisco's Mission District. The relevant block of 21st, which runs east to west, is intersected on the east by Shotwell Street and on the west by South Van Ness Avenue.

1. Eyewitness testimony

An Uber driver testified that around 10:25 p.m. that night, he was driving east on 21st toward Shotwell. He turned left onto Shotwell, but a Chevrolet sedan was stopped in the lane, blocking him from clearing the crosswalk and continuing down that street. To his left, at the northwestern corner of 21st and Shotwell, he noticed three young men arguing. He could not hear what they were saying, but their voices were raised.

2

The driver testified that "suddenly," two of the men "started throwing punches" at the third, and both made contact. The third man "tried [to] punch back" but did not appear to land any punches. According to the driver, "[o]ne of the two guys pulled a gun" and shot once from his right hip at the third man. The third man then began "limping" toward the curb. The driver briefly turned his head and did not see where the victim went, but when he turned back, he saw the other two men running toward the Chevrolet. One man, whom the driver later identified as A.M., got into the driver's seat, and the other man, whom the driver later identified as Herrera, got into the passenger's seat.[1] The Chevrolet then drove away down Shotwell.

The police did not locate and interview S.S., the sex worker with Sac Ajtzalam before the shooting, until the following fall. At trial, S.S. testified that she was familiar with the area, which was "known . . . for sex workers." Generally, rates started at $100, and payment was in cash.

S.S. was on the north side of 21st between Shotwell and South Van Ness when Sac Ajtzalam crossed the street to ask for a date. As they spoke, they faced the street with their backs against a wall. S.S. testified that two men "walking together" approached her and Sac Ajtzalam "really fast" and "said some things in Spanish" that she could not understand.

According to S.S., one of the men pulled out a handgun and placed it against Sac Ajtzalam's stomach. Unlike the Uber driver, she did not see a "physical altercation" between the men. When S.S. saw the gun, she "turned around and ran" toward a liquor store on the corner of 21st and South Van Ness. As S.S. looked back to see if anyone was following her, she observed

---

[1] At trial, the Uber driver incorrectly identified A.M. as the shooter, although he later indicated he could not remember whether the shooter got into the driver's seat or passenger's seat.

Sac Ajtzalam running toward Shotwell and the other two men following him. She turned her head forward again, at which point she heard a gunshot. She then ran into the liquor store without looking back.

A man preparing to leave for work was standing near his car on the south side of 21st when he heard "one or two gunshots." He turned and saw a man fall down near the southwest corner of 21st and Shotwell, get back up, and keep running.

Another man who lived nearby was sitting by his bay window facing Shotwell when he heard a gunshot. When he looked outside, he saw three people running at the northwest corner of 21st and Shotwell. One then ran toward the southwest corner of the intersection. That person began to slow down, "their legs kind of slipped out," and they "collapse[d] or . . . f[e]ll backwards" and hit the ground "hard." Meanwhile, the other two people sprinted north on Shotwell, got into a car, and departed.

2.     Surveillance videos

Surveillance videos of the block of 21st between Shotwell and South Van Ness were played for the jury and admitted. This evidence consisted of (1) approximately 40 clips from four security cameras; and, as discussed further below, (2) selected clips that were lightened, zoomed into, or spliced together.

Three cameras were located outside a building on the south side of 21st, near the middle of the block. One pointed directly across the street toward where Sac Ajtzalam and S.S. stood; one pointed diagonally down 21st toward Shotwell; and one pointed diagonally down 21st toward South Van Ness. These cameras recorded in color and captured sound. They were motion-activated, and they generated files with timestamps accurate to the second.

4

The fourth camera was located outside the liquor store on the northeast corner of 21st and South Van Ness, pointing directly down 21st toward Shotwell.  This camera generated a timestamp to the second, which was a few minutes off from the other three cameras.  It recorded in black and white without sound, and the picture quality was worse than that of the other cameras.

The surveillance footage shows Sac Ajtzalam walking on the southern sidewalk of 21st, toward Shotwell, at 10:24 p.m.  As S.S. walks by on the opposite sidewalk, Sac Ajtzalam pauses and says something to her, and she greets him.  He then crosses the street and stands next to her.

A few seconds later, A.M. and Herrera approach Sac Ajtzalam and S.S. from the direction of Shotwell.  A.M. is a few steps in front of Herrera, but they appear to pull nearly even with each other as they get close to Sac Ajtzalam.  The recording from the camera facing across 21st cuts off at this point, but the recording from the building camera facing toward Shotwell shows A.M. and Herrera reach Sac Ajtzalam.  The image is blurry, but Herrera can be identified by his light-colored pants.

A second or so after A.M. and Herrera reach Sac Ajtzalam, a loud double click can be heard, and S.S. immediately moves away from the men.[2]  Meanwhile, right after the click, Herrera appears to move to face Sac Ajtzalam.  The footage from the liquor-store camera is low quality, but it

---

[2] In closing, the prosecution argued that this sound was a gun being racked, having presented evidence that semiautomatic handguns like the one Herrera had "generally . . . make a clicking noise when you pull the slide back."  The defense responded that it was not reasonable to infer that the sound was a gun racking, because the camera did not pick up any other sound from across the street except for the gunshot.

5

seems to show Sac Ajtzalam moving abruptly back against the wall, as if shoved.  S.S. then runs toward South Van Ness and into the street.

Meanwhile, footage from the building camera facing toward Shotwell shows Herrera and A.M. follow Sac Ajtzalam from a few feet behind as Sac Ajtzalam moves, possibly backing up, along the northern sidewalk of 21st toward Shotwell.  The three men speed up, and almost immediately—about 10 to 12 seconds after A.M. and Herrera first reached Sac Ajtzalam—there is a flash and the sound of a gunshot.  Sac Ajtzalam runs across the crosswalk from the northwest to the southwest corner of 21st, and Herrera and A.M. run around the northwest corner onto Shotwell.

3.     The autopsy and other physical evidence

Around 10:30 p.m., the San Francisco police received a ShotSpotter notification of a gunshot on Shotwell.  When officers arrived on the scene, they found Sac Ajtzalam lying on his back at the southwest corner of 21st and Shotwell.  In his back pocket was about $100 in cash and an "electronic device" with corded earbuds attached, and in his front pocket was a wallet containing about $850 in cash.

Sac Ajtzalam was transported to the hospital but ultimately died.  An autopsy showed he was killed by two through-and-through gunshot wounds, one to the left side of his chest and the other to his left forearm.  The medical examiner who performed the autopsy testified that a single bullet could have caused the wounds by passing through Sac Ajtzalam's arm and chest if he had his arm in front of his body with his elbow bent and raised.

Sac Ajtzalam had a blood-alcohol content of .08 percent, which might have been higher at the time of the shooting.  He had "nondescript" scrapes on his left knee and the left side of his face, which happened around the time

6

of death.  The evidence tended to suggest he sustained these scrapes when he fell.

A nine-millimeter Luger cartridge casing was found on the northwest corner of 21st and Shotwell, and a bullet fragment was found in the eastern crosswalk of that intersection.  A metal belt buckle broken into three pieces was found near the cartridge casing, and a belt was on the ground next to Sac Ajtzalam's arm.

A defense expert testified that the condition of the belt buckle suggested it was "hit by some significant force."  She also testified that the bullet's condition showed it hit something else before striking Sac Ajtzalam's body, since it did not hit any bone.  Collectively, this evidence gave rise to "a likely hypothesis that the bullet struck the belt buckle" while Sac Ajtzalam was swinging the belt "and was deflected or ricocheted prior to striking [him]."  The expert opined that the bullet could not have traveled on the "trajectory into [his] arm and across [his] torso" his wounds indicated by being fired at the ground and then ricocheting.

B.      *Herrera's Arrest and the Recovery of Additional Evidence*

After the Chevrolet left the scene, the Uber driver followed it.  He soon spotted a police car, flagged it down, and stopped to report the shooting to the officers inside.  He also gave them the Chevrolet's license-plate number.

The police officers quickly located the Chevrolet and attempted to conduct a traffic stop, but the car sped up instead.  After a chase of several blocks, the Chevrolet reached a dead end, and both of its occupants exited.  The officers then drew their guns and ordered the two people to stop.  The driver, later identified as A.M., ran one way, and the passenger, later identified as Herrera, ran the other way.  A.M. was quickly apprehended.  After a more extensive search, Herrera was located hiding in a park and

7

arrested without resistance.  He was carrying his own cell phone and about $160 in cash.

A semiautomatic handgun with an extended magazine containing 19 rounds of nine-millimeter Luger ammunition was recovered from the Chevrolet's front passenger's seat.  Forensic testing showed that the gun, which did not have a serial number, was used to shoot the cartridge case and bullet recovered at the scene.  A bag of marijuana with Herrera's DNA on it was in the front passenger's-side door.

### C.    Herrera's Out-of-court Statements

#### 1.    Police interrogation

A video recording of Herrera's interrogation the morning after his arrest was played for the jury.  Herrera stated he was in the Chevrolet's passenger's seat during the car chase, and he readily admitted the gun left there was his and he had been carrying it most of the day.

Herrera initially denied knowing A.M.'s name, claiming he had just met A.M. through another friend.  After the police sergeant questioning him alluded to the shooting, Herrera said he and A.M. were walking to the store when they encountered Sac Ajtzalam.  Herrera did not "know how it started" or what A.M. and Sac Ajtzalam said to each other, but Sac Ajtzalam reached for his waist.  Herrera, who was about four feet away from Sac Ajtzalam, then pulled out his gun and pointed it at the ground.  Herrera thought this would get Sac Ajtzalam to "leave [him] alone," since "most people . . . when they see a gun[,] they'll . . . start automatically running."  But Sac Ajtzalam "rush[ed]" him, so Herrera shot at the ground once, not intending to hurt the other man.

The sergeant told Herrera there was a witness "who saw three people fighting" and asked whether Herrera threw any punches.  Herrera said he

8

did not, but A.M. "tried to do something first" and Herrera then "tried to back [A.M.] up" and "have [Sac Ajtzalam] run off" and "leave [them] alone." After Herrera stated that Sac Ajtzalam was "small as shit," the sergeant asked whether it would "make sense for a small guy to start . . . talking trash to two guys."[3] Herrera said he "wasn't there at first" and indicated the initial confrontation was between A.M. and Sac Ajtzalam only.

Herrera reacted with surprise when the sergeant told him he "hit the guy out on Shotwell Street and he died." Herrera then admitted he had known A.M. "for a while" and they were friends. According to Herrera, before the shooting he and A.M. dropped off another friend and headed to the McDonald's at 16th Street and Potrero Avenue. A.M. was driving, and Herrera was in the back seat. On the way, they stopped at Herrera's home so Herrera could use the bathroom, and they then proceeded toward the McDonald's.

According to Herrera, A.M. double-parked the car on Shotwell and left the engine running. Herrera initially claimed they both got out to go to the liquor store at 21st and South Van Ness, but he could not explain why A.M. would have parked a block away from it. Under further pressing, Herrera indicated that A.M. was high on Xanax and Percocet and his behavior could not be explained.

Herrera then lamented he was "going to be stuck in this bitch for life" because A.M. "wanted money for his birthday[,] that's the only reason." Herrera explained that A.M. was turning 18 years old in a few days and had said he just lost some money. But Herrera denied knowing whether A.M.

---

[3] Sac Ajtzalam was five feet, four inches tall. Herrera testified that he himself was an inch taller than that and weighed about 135 pounds at the time of the murder.

intended to commit a robbery or "'what [A.M.] was trying to do" at all. Herrera also flatly denied intending to rob anyone himself, stating he was "scared" when Sac Ajtzalam "tried to come at [him]" and was "just trying to defend [him]self." He also denied that either he or A.M. tried to take any property from Sac Ajtzalam.

The sergeant then revealed that A.M. claimed he did not know Herrera and Herrera appeared out of nowhere while *Sac Ajtzalam* was trying to rob *A.M.* According to the sergeant, A.M. said Herrera shot Sac Ajtzalam and then forced A.M. at gunpoint to drive away from the scene. The sergeant said A.M. was afraid Herrera was going to shoot him and "was crying to his mommy."[4]

Herrera stated, "No, no. [A.M.] was not crying. He knew exactly what he was doing." When the sergeant asked what A.M. was doing, Herrera said, "*[H]e* wanted to go rob that dude." (Italics added.)[5] The sergeant repeated, "He wanted to go rob him?," and Herrera responded, "Yes bro, I tried to tell him no hella times, bro. I tried to tell him no bro, I don't wanna do it bro. I'm just trying to go get some fucking McDonald's bro. This nigga gets out of the car bro, and he . . . still tries to do it bro, and . . . I see this guy as my fucking like little brother bro, and you feel me if somebody tries to hurt him bro of course I'm going to get offended bro because I knew him for so long bro."

Herrera then elaborated on the events leading up to the shooting. He claimed that as they were driving, A.M. said, "[T]here's hoes over here, bro,"

---

[4] The sergeant was apparently describing information he gleaned from a phone call A.M. made to his mother after being arrested, which the sergeant observed. Our record indicates that A.M. served less than a year for his involvement in Sac Ajtzalam's death.

[5] Herrera clearly emphasizes the word "he" in this portion of the interrogation recording.

and parked the car. Herrera told A.M. he did not "give a fuck" and told him to go to McDonald's, but A.M. exited the car. A.M. then "walked up on" Sac Ajtzalam and S.S. and punched Sac Ajtzalam. Sac Ajtzalam "reached for something," at which point Herrera "just shot once" to get him to go away, and Sac Ajtzalam ran off while Herrera and A.M. ran back to the car. Herrera denied either that he punched Sac Ajtzalam or that Sac Ajtzalam punched A.M.

Near the end of the interrogation, when asked whether A.M. had any money on him, Herrera stated that A.M. had $300 he got when he "took [a phone] from a fucking lady." Herrera said he was nearby when A.M. stole an iPhone earlier that day from a woman at 24th Street and Potrero Avenue. A.M. then sold the phone to a man at the Daly City BART station. Herrera reported that afterward, A.M. took out the cash "and counted it in [Herrera's] face." The sergeant asked whether Herrera was "with [A.M.] when he was doing any other robberies or any other licks or anything."[6] Herrera responded, "No. Just the one with him today bro but I shoulda never went with him bro."

2. Herrera's communications with his girlfriend

A few hours after being interrogated, Herrera spoke to his girlfriend from jail. A recording of the call was played for the jury. During the call, Herrera admitted he had had "a weapon on [him]." He told his girlfriend, "[Y]ou know what's crazy? I didn't even want to do it. I just wanted to go get some McDonald's." Herrera stated that while A.M. promised to drive him to McDonald's, "[t]his nigga did not take me to fuckin' McDonald's. This nigga took me to go hit a lick. This nigga tried to hit the lick, bruh."

---

[6] The sergeant testified that doing a "lick" is slang for committing "a robbery or a theft."

11

When Herrera's girlfriend asked what time this occurred, Herrera responded, "Last night.  Right after I told you we're gonna go make money.  I was—I was just supposed to go home after we smoked, too.  I don't know why the fuck I let this . . . little bitch-ass nigga just fuck with my life bruh."  Herrera's statement about what he had "told" her apparently referred to a text message he sent her about 30 minutes before the murder.  After she texted, "But oh wait u the one who's out," Herrera responded, "Makin money."

### D.     The iPhone Theft

The police were not aware that the iPhone theft was connected to Herrera and A.M. until Herrera mentioned it during his interrogation.  Around 4:30 p.m. on the day of the murder, the police responded to 24th and Potrero based on a report of a stolen iPhone.  A woman, S.N., told a police officer she was on the phone when a young male approached and grabbed it from her hand.  He hit her face at the same time he grabbed the phone, causing numbness in her lip and nose area.[7]

Surveillance footage from a Muni bus showing the theft was played for the jury.  The video shows S.N. standing at the corner of 24th and Potrero talking on a phone.  From a distance, after the bus has traveled away from her on Potrero and stopped partway down the block, its rear camera video shows A.M. run by her.  He then runs down Potrero, past the bus, with Herrera running about 10 feet behind him.  S.N., farther behind, runs after them yelling.  The bus's front camera shows A.M. and Herrera run toward a light-colored sedan, which has just double-parked farther down Potrero.  The

---

[7] As discussed further below, S.N. did not testify at trial, and her statement was introduced through the officer's testimony.

two then enter the car on the passenger's side, and the car drives away before S.N. can reach it.

### E. Herrera's Testimony

Herrera was raised by his grandmother after he went into foster care around the age of two. At the time of the murder, he lived with her and worked as a security guard. He also received $1,000 a month "[f]rom being in foster care." He claimed he had about $4,000 saved and was not concerned about money.

Herrera testified that around 4:00 p.m. on the day of the murder, A.M. and two other acquaintances, C. and A., picked him up from his home. Herrera also made money by selling marijuana to friends and acquaintances, and he had arranged to sell some to the others and smoke with them. Herrera had known A.M. for about five years but hung out with him only occasionally.

Herrera had his gun, which he told the others so they would "know not to do anything dumb, to drive normal." Herrera testified that he bought the gun on the street about six months before the murder to protect himself. He described numerous incidents during which he was hurt or threatened by strangers, including being shot at and beat up. The defense produced medical records corroborating some of these events, including a September 2019 incident that he claimed prompted him to buy the gun.

On the way to smoke marijuana with A.M. and the others, Herrera asked to stop at a corner store at 24th and Potrero to buy something "for when [he] got high." C., who was driving his own car, pulled over and let Herrera and A.M. out of the car. They went into the store, and Herrera bought a bottle of water. They then waited outside for C. "to come back around" to pick them up.

13

C. "pulled up around the corner," and Herrera and A.M. began walking toward the car. A.M. was a few steps ahead of Herrera. "[O]ut of the corner of [his] eye," Herrera saw A.M. "do something" and start running. Herrera heard a woman yelling and started running himself, "out of instinct." He and A.M. ran to the car, and C. drove them away.

Herrera testified that he did not know A.M. planned to steal the iPhone and had no intent to help A.M. do so. Herrera felt badly for S.N. because she was "an older lady," and he got "angry" at A.M. for stealing from her. In particular, Herrera was worried about getting in trouble himself, and he told A.M., "Don't do nothing with me there."

A.M. arranged to sell the iPhone, and C. drove the group to the Daly City BART station so A.M. could do so. On the way, A.M. said he was mad because he had lost $900. After he returned to the car, A.M. displayed three hundred-dollar bills. The group then drove to Bayview-Hunter's Point and smoked marijuana in the car for a few hours. Herrera did not do any other drugs, but others in the group also took Xanax and Percocet.

C. began "acting weird," so A.M. drove the car to C.'s house to drop him off. Herrera, A.M., and A. then left in A.M.'s car, which A.M. had parked there earlier. Herrera asked A.M. to take him to McDonald's because he had not eaten all day, but they stopped at Herrera's home first so he could use the bathroom. When Herrera returned to the car, A. asked to be dropped off at his sister's house.

On the drive to A.'s sister's house, Herrera sold A. some marijuana. Herrera testified that his girlfriend was often worried about what he was doing, and when he texted her that he was "Makin money," he meant the sale he had just made to A. Herrera admitted the marijuana found in the

14

Chevrolet was his, and some of the money he had when arrested was from "[selling] weed to people in the car."

After dropping off A., A.M. and Herrera headed to the McDonald's at 16th and Potrero, which was the nearest one still open. Herrera was "tired from all the weed [they] were smoking, so [he] kept like dozing off and waking back up at random parts." As they neared the intersection of 21st and Shotwell, A.M. stopped at a stop sign and said, "There's some hoes over there."

A.M. then traveled through the intersection and double-parked on Shotwell. Telling Herrera to "hold on" and leaving the engine running, A.M. got out of the car and walked back toward the corner. Herrera testified that he did not know why A.M. got out of the car but saw him walk back to the corner and start looking at his phone, making Herrera think he was waiting for someone.

Once A.M. reached the corner, Herrera exited the car as well, with his gun in the front pocket of his hoodie. Herrera testified that he did not feel comfortable waiting in the car by himself at night in that area. As he approached A.M., A.M. "walked off" in the street down the north side of 21st, next "to the driver's side" of parked cars. Herrera followed "a few steps" behind him. He admitted that contrary to what he said during his interrogation, the two were not intending to go to the liquor store.

Herrera saw a man standing across 21st smile at them, and he thought A.M. was going to cross the street "to go see that guy." Instead, A.M. cut between two parked cars onto 21st's northern sidewalk and approached "a lady and a guy," S.S. and Sac Ajtzalam. Herrera was "[r]ight . . . behind" A.M. As A.M. got close to Sac Ajtzalam, A.M. "said something" in Spanish to

15

him, but Herrera could not hear what it was. Sac Ajtzalam said something back, and then he and A.M. started fighting near the wall.

According to Herrera, A.M. punched Sac Ajtzalam first, and Sac Ajtzalam swung back at him. Herrera "kept backing up" toward the parked cars, so he could not tell whether Sac Ajtzalam landed any punches. Meanwhile, S.S. "started backing up" when A.M. and Herrera approached, and she ran away screaming "as soon as . . . the first word was said." Contrary to S.S.'s testimony, Herrera denied taking his gun out before she ran away or pushing it into Sac Ajtzalam's stomach. And contrary to the Uber driver's testimony, Herrera claimed he never hit or touched Sac Ajtzalam himself.

During the fight, Sac Ajtzalam "slipped" when he tried to dodge one of A.M.'s punches. Sac Ajtzalam stood back up and "grabbed for his waist." He appeared to be holding "something silver," which Herrera thought was a gun. Feeling "scared," Herrera took his own gun out, hoping Sac Ajtzalam would run away. Instead, Sac Ajtzalam "rushed" Herrera. Herrera shot his gun "at the floor," intending to scare the other man but not hit him. Sac Ajtzalam started running away, across the street. He appeared "perfectly fine," and Herrera did not realize he had been hit.

Herrera testified that he did not want to rob Sac Ajtzalam and did not know A.M. intended to do so. He denied "hav[ing] any idea why [A.M.] walked up to [Sac Ajtzalam] that night." Explaining why he stated during the interrogation that A.M. "wanted to go rob that dude," Herrera said he was responding to A.M.'s false story as relayed by the sergeant: "I just took what [A.M.] said, I don't know. He said [Sac Ajtzalam] was trying to rob him. There's only one reason he would say that[: ¶] . . . [¶] If [A.M.] was trying to rob [Sac Ajtzalam]." Herrera also claimed that when he said he "tried to tell

16

[A.M.] no hella times" in response to the sergeant's question about A.M.'s wanting to rob Sac Ajtzalam, he was referring to his statements to A.M. after A.M. stole the iPhone, not anything involving the charged crimes. Finally, Herrera claimed he told his girlfriend during the jailhouse call that A.M. "took [him] to go hit a lick" because the sergeant used that term, not because he knew A.M. intended to rob someone.

### F. Procedural History

The operative information charged Herrera with felony counts of murder, attempted second degree robbery, and unlawfully carrying a loaded, unregistered firearm, and a misdemeanor count of resisting a peace officer.[8] As to the murder and attempted-robbery counts, it was alleged that Herrera personally used a firearm and personally and intentionally discharged a firearm causing death.[9]

The jury found Herrera guilty of first degree murder and convicted him of the remaining charges and enhancements. Relying on section 1385 and *People v. Dillon* (1983) 34 Cal.3d 441, the trial court reduced the murder conviction to second degree murder. It then sentenced Herrera to 15 years to life in prison for the murder and a concurrent term of one year for resisting a

---

[8] The charges were brought under Penal Code sections 187, subdivision (a) (murder), 211 and 664 (attempted robbery), 25850, subdivisions (a) and (c)(6) (carrying loaded, unregistered firearm), and 148, subdivision (a)(1) (resisting peace officer). All further statutory references are to the Penal Code unless otherwise noted.

[9] The firearm allegations were made under sections 12022.5, subdivision (a) (personal use), and 12022.53, subdivision (d) (personal and intentional discharge causing death). The information also alleged that Herrera personally used a firearm under section 12022.53, subdivision (a), but the correct subdivision is subdivision (b) (which appeared on the verdict forms).

peace officer.  Terms on the firearm enhancements accompanying the murder conviction and on the remaining convictions and enhancements were stayed.

## II.
### DISCUSSION

A.    *Substantial Evidence Supports the Convictions of Murder and Attempted Robbery.*

Herrera first claims there was insufficient evidence of intent to support the conviction of attempted robbery and in turn, a conviction of felony murder based on that crime.  We are not persuaded.

1.    General legal standards

In determining whether sufficient evidence supports a conviction, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  We " ' "must accept logical inferences that the jury might have drawn from the evidence even if [we] would have concluded otherwise." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 811–812.)  Thus, reversal is inappropriate unless " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)  " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)

"Robbery is the felonious taking of personal property in the possession of another, from [the other's] person or immediate presence, and against [the

18

other's] will, accomplished by means of force or fear." (§ 211.) A conviction of attempted robbery requires proof of "(1) the specific intent to commit robbery, and (2) . . . a 'direct but ineffectual act done toward its commission.' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1018, quoting § 21a.) The required intent is "the specific intent to deprive the victim of the property permanently," and an "intent to cause the victim to experience force or fear" is unnecessary. (*People v. Anderson* (2011) 51 Cal.4th 989, 994–995 (*Anderson*).)

The jury was instructed on aiding and abetting principles. To establish a defendant's liability as an aider and abettor, the People must first prove that "someone other than the defendant . . . attempted or committed a crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Then, they must prove the defendant's (1) " 'knowledge of the direct perpetrator's unlawful intent,' " (2) " 'intent to assist in achieving those unlawful ends,' " and (3) " 'conduct . . . that in fact assists the achievement of the crime.' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069; see § 31.) The defendant must know that the direct perpetrator intends to commit the crime, but the defendant need have only the " 'intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense.' " (*People v. Montoya* (1994) 7 Cal.4th 1027, 1044; see *People v. Maciel* (2013) 57 Cal.4th 482, 518.)

A defendant who participates in attempted robbery is guilty of felony murder if a death occurs during the attempt and, as relevant here, the defendant was "the actual killer." (§ 189, subds. (a), (e)(1).) Generally, felony murder requires " 'the specific intent to commit the underlying felony.' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140.) But to be convicted of felony murder on the basis of aiding and abetting the underlying felony, the defendant need only have been aware of the perpetrator's intent to commit

19

the felony and intended to aid and abet the perpetrator in committing the felony. (See *People v. Campbell* (2015) 233 Cal.App.4th 148, 162–163 [approving jury instruction on felony murder where defendant was actual killer and aided and abetted underlying robbery].)

Here, the jury was instructed on two theories of first degree murder, felony murder and premeditated murder. Normally, when "a count is submitted to a jury on alternative theories, and the evidence is insufficient as to one theory, we assume that the jury rested its verdict on the theory adequately supported by the evidence." (*People v. Silva* (2001) 25 Cal.4th 345, 370.) Under such circumstances, reversal is unwarranted unless the record "affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.) As we now discuss, substantial evidence supports Herrera's conviction of felony murder based on his aiding and abetting of attempted robbery. Thus, we need not address his separate claim that there was insufficient evidence of premeditated murder, since there is no indication the jury relied on that theory. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 424.)

2. Analysis

Herrera argues there was insufficient evidence that A.M. intended to commit a robbery and in turn, that he was aware of A.M.'s intent to rob or that he intended to aid A.M. in doing so. Factors to be considered in determining whether a defendant aided and abetted a crime include " 'presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen, supra,* 61 Cal.4th at p. 1054; *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.) The defendant's knowledge of the

20

perpetrator's purpose and intent to assist must "ar[i]se sometime prior to or during the commission of [the crime]." (*Haynes*, at p. 1294.)

We conclude there was substantial evidence that A.M. intended to commit robbery and Herrera was aware of that intent. According to Herrera, A.M. said he had lost $900 and wanted money for his birthday, and Herrera was fully aware that A.M. had stolen an iPhone earlier that day and sold it for $300. The jury could reasonably infer that A.M. wanted to recover more money and, when he abruptly double-parked after observing there were "hoes," he intended to steal from someone on the street. There was testimony that the area was known for sex work, a cash business, and Herrera admitted he knew that "prostitutes . . . [were] around the area." These circumstances, combined with the fact that Sac Ajtzalam was standing with a sex worker, further supported the conclusion that A.M. intended to rob him and that intent was apparent to Herrera.

There was also significant evidence that Herrera was not only aware of what A.M. planned but also intended to aid him. S.S. testified that Herrera put a gun to Sac Ajtzalam's stomach, and the Uber driver testified that Herrera and A.M. both punched Sac Ajtzalam. Moreover, the surveillance footage shows A.M. and Herrera approaching Sac Ajtzalam in tandem, which the jury could reasonably infer meant the two were executing a plan together. The jury could also reasonably infer that the double-click sound was Herrera racking the handgun, especially since S.S. appears to react immediately by departing down the sidewalk. In addition, it appears that Herrera fired while he and A.M. were chasing Sac Ajtzalam. In short, there was plenty of evidence that Herrera actively participated in an attempt to rob Sac Ajtzalam and did not merely react defensively in a situation he did not create.

21

Herrera suggests that "[m]any motives" other than robbery for A.M. to approach Sac Ajtzalam were "equally plausible," such as gang-related disrespect or a "dispute over a woman." Citing *People v. Morris* (1988) 46 Cal.3d 1, he argues that "[l]ack of evidence of some other motive . . . does not in and of itself supply evidence that the motive was robbery." Although we agree with this statement of the law, we disagree that it applies here.

In *Morris*, the defendant was found guilty of robbery and murder with a robbery special circumstance. (*People v. Morris*, *supra*, 46 Cal.3d at p. 9.) The victim was found "in the restroom of a public bathhouse," naked and shot to death. (*Id.* at p. 19–20.) There was "no evidence that any personal property was in [his] possession at the time of the murder." (*Id.* at p. 20.) The defendant's acquaintance testified that the defendant said " 'he go out there and make money, you know, with these homosexuals, you know, dates—he had to kill one.' " (*Ibid.*) In addition, a few days after the murder, the defendant used a credit card that another man had loaned to the victim a few months beforehand. (*Ibid.*) The Supreme Court reversed the robbery conviction and robbery special circumstance, observing that while it could "*speculate* about any number of scenarios that may have occurred on the morning in question," there was no evidence "from which the jury could reasonably infer that [the] defendant deprived the victim of personal property in his possession by means of force or fear." (*Id.* at pp. 20–21, 41.) Here, in contrast, there was significant evidence from which to infer that A.M. meant to rob Sac Ajtzalam and Herrera was aware of that intent, and little to no evidence of the other potential motives Herrera posits.

Herrera also claims the iPhone theft did not constitute evidence that he intended to rob Sac Ajtzalam or assist A.M. in doing so. We agree that there was little if any evidence that Herrera participated in the iPhone theft, that

the iPhone theft was "dissimilar" to the attempted robbery in certain respects, including the relative lack of force or threat used, and that A.M.'s own need for money did not supply a motive for Herrera to steal. But even if the earlier misconduct did not support an inference that Herrera had the same intent or plan on both occasions, it was still evidence that he knew A.M. intended to permanently deprive Sac Ajtzalam of property. This knowledge, combined with Herrera's level of participation in the charged crimes as demonstrated by the surveillance footage, constituted substantial evidence that Herrera intended to assist A.M. in committing robbery.

Finally, Herrera argues that the "Makin money" text and his interrogation statements, including his statement that A.M. "wanted to go rob that dude," did not constitute evidence that he knew of and wished to assist A.M.'s plan to steal from Sac Ajtzalam. The argument, however, fails to recognize our deferential standard of review. Herrera offers interpretations of these statements that, if accepted, would neutralize them as evidence of his criminal intent. But he fails to establish that the jury could not have reasonably interpreted them otherwise. Thus, although we find it unnecessary to rely on these statements to support our conclusion, they constitute additional substantial evidence that Herrera intended to aid and abet A.M. in committing robbery.

B.      *The Trial Court Did Not Abuse Its Discretion By Admitting Evidence of the iPhone Theft.*

Herrera claims the trial court erred by admitting evidence of the iPhone theft because it was irrelevant and unduly prejudicial. Again, we are not persuaded.

1.      Additional facts

Before trial, the People moved to admit evidence of the iPhone theft under Evidence Code section 1101, subdivision (b), as relevant to Herrera's

"knowledge of [A.M.'s] intent to commit robbery" and his own intent. The defense argued the evidence was impermissible character evidence and unduly prejudicial under Evidence Code section 352.

The trial court ruled the evidence was admissible. It found the evidence was relevant under Evidence Code section 1101, subdivision (b), to prove Herrera's knowledge that A.M. committed the prior crime and in turn, to prove Herrera's intent during the charged crimes. The court also determined the evidence was not unduly prejudicial under Evidence Code section 352 because the iPhone theft was less serious than the charged crimes and "noncomplicated"; Herrera discussed the prior crime during his interrogation, which was being admitted anyway; and he could argue that his relative lack of involvement in the prior crime showed he was not guilty of attempting to rob Sac Ajtzalam.

As mentioned above, a police officer who interviewed S.N. at the scene testified about her statements, and Muni surveillance footage showing the iPhone theft and A.M. and Herrera running away was played for the jury. The jury was instructed under a modified version of CALCRIM No. 375 that "[t]he People presented evidence of other behavior by the defendant that was not charged in this case that the defendant was present with [A.M.] when [A.M.] stole an iPhone from [S.N.] and later sold it. [¶] . . . [¶] If you decide that the defendant committed the acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant acted with the intent to commit robbery against . . . Sac Ajtzalam in this case; or [¶] [t]he defendant knew [A.M.] intended to commit robbery against . . . Sac Ajtzalam when he allegedly acted in this case."

24

### 2.	General legal standards

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Generally, evidence of a person's previous conduct "is inadmissible when offered to prove [the person's] conduct on a specified occasion." (*Id.*, § 1101, subd. (a).) But "evidence that a person committed a crime, civil wrong, or other act" is admissible "when relevant to prove some fact," such as intent or knowledge, "other than [the person's] disposition to commit such an act." (*Id.*, § 1101, subd. (b).)

Even if evidence is otherwise relevant and admissible, it may be excluded "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Scott* (2011) 52 Cal.4th 452, 490.) The "prejudice" referred to "is not synonymous with 'damaging,' " but rather describes " ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*Scott*, at p. 491.)

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 337.) Under this standard, we do not reverse " ' "unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." ' " (*People v. Nieves* (2021) 11 Cal.5th 404, 445.)

### 3.	Analysis

Herrera claims the iPhone theft was insufficiently similar to the charged conduct to be admissible to prove intent and was unduly prejudicial under Evidence Code section 352. We disagree on both points.

25

The required "degree of similarity" between uncharged and charged conduct "depends on the purpose for which the evidence was presented," with "[t]he least degree of similarity [being] needed when . . . the evidence is offered to prove intent." (*People v. Jones* (2011) 51 Cal.4th 346, 371.)  For that purpose, " ' "the uncharged [conduct] need only be 'sufficiently similar [to the charged offenses] to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " ' " (*People v. King* (2010) 183 Cal.App.4th 1281, 1300; *People v. Rocha* (2013) 221 Cal.App.4th 1385, 1394–1395.)

Although evidence of the iPhone theft was offered to show Herrera's intent and knowledge, it was primarily significant to demonstrate A.M.'s intent.  The theft suggested that A.M. also harbored the intent to steal when he approached Sac Ajtzalam and that Herrera, who was present during the prior incident, knew of A.M.'s intent as required for a conviction of attempted robbery as an aider and abettor.  Thus, Herrera's argument that there was little evidence he participated in the iPhone theft misses the mark.  The prosecution did not try to prove Herrera was guilty of that crime, and the challenged evidence was not admitted to prove Herrera's own intent during the theft.

We therefore turn to the primary issue, whether the iPhone theft was sufficiently similar to prove A.M.'s intent during the charged incident.  Relying on *Rocha*, Herrera argues the iPhone theft was not " ' "roughly similar" ' to the charged conduct" because "[i]t was a classic theft[] from the person," not a robbery accomplished by force or fear.  (Quoting *People v. Rocha*, *supra*, 221 Cal.App.4th at p. 1395.)  Although we are willing to assume the iPhone theft did not amount to a robbery, it was nonetheless sufficiently like the attempted robbery because both crimes "contained one

crucial point of similarity—the intent to steal from [strangers] whom [A.M.] selected" and approached on the street. (*People v. Jones*, *supra*, 51 Cal.4th at p. 371.) As we have said, robbery does not require "an intent to apply force against the victim or to cause the victim to feel fear"; it suffices "if the defendant committed a forcible act against the victim motivated by the intent to steal." (*Anderson*, *supra*, 51 Cal.4th at pp. 991–992.) Thus, even if the iPhone theft was not a robbery because there was no use of force or fear, the incident still supported the inference that A.M. intended to steal from Sac Ajtzalam.

Herrera also argues in passing that the iPhone theft was inadmissible under Evidence Code section 352. He claims that even if the evidence had "marginal relevance," it was unduly prejudicial because "there was no indication that any member of [the earlier, larger] group had been punished" for the prior misconduct. But as we have discussed, the iPhone theft was clearly relevant to prove A.M.'s intent during the charged conduct and Herrera's knowledge of that intent. Nor was the iPhone theft especially prejudicial, as it was significantly "less inflammatory" than the charged conduct, and it was committed by A.M. (*People v. Mani* (2022) 74 Cal.App.5th 343, 372.) Thus, it is unlikely the jury was motivated to punish *Herrera* for the iPhone theft by convicting him of the more serious charges.

In short, Herrera fails to demonstrate that the trial court abused its discretion under Evidence Code sections 1101 and 352 by admitting evidence of the iPhone theft. As a result, this claim fails.

## C. Herrera's Claim that His Right to Confront Witnesses Was Violated Lacks Merit.

Next, Herrera argues that admitting S.N.'s statement to the police about being injured during the iPhone theft violated his constitutional right to confront witnesses. We are again not persuaded.

### 1. Additional facts

San Francisco Police Officer Irving Garcia, Jr., a certified Spanish interpreter, responded to the iPhone theft. On direct, he testified that S.N. seemed "shaken up, nervous," and "stated she had slight numbness to her upper lip and lower nose area." When asked why he thought S.N. was "shaken up," the officer responded, "Just, you know, she was crying in disbelief . . . [about] the incident that just [happened] to her." The prosecutor then asked, "When you say 'in disbelief[,]' did she say anything to make you think she was in disbelief?" Herrera objected on hearsay and confrontation-clause grounds.

The trial court then held a hearing under Evidence Code section 402 to determine whether S.N.'s statement to Officer Garcia was admissible, since it was unclear whether S.N. would testify. Specifically, the prosecution sought to introduce the officer's testimony that S.N. told him that "[s]he was standing on the corner using the cell phone, that she got struck in the face and [the] phone was stolen from her pretty much at the same time." The court ruled that S.N.'s statement was admissible under Evidence Code section 1240, the spontaneous-statement exception to the hearsay rule.

During the hearing, it also became apparent there were body-cam recordings of S.N.'s interview at the scene that the defense had not received. The prosecutor stated he did not intend to introduce these recordings, but the trial court indicated the defense should have a chance to review them before

28

cross-examining Officer Garcia.[10]  Herrera then unsuccessfully moved to strike the officer's testimony on the basis of late discovery.  The court reserved ruling on the confrontation-clause issue until the defense could review the body-cam footage.

Subsequently, after reviewing some of the body-cam footage itself and hearing the parties' arguments, the trial court ruled that S.N.'s statement was non-testimonial and therefore admissible under the confrontation clause. Relying primarily on *Michigan v. Bryant* (2011) 562 U.S. 344 (*Bryant*), the court concluded that S.N.'s statement was taken in response to "an ongoing emergency," not as part of "an interview or an interrogation for the purpose[] of preparing for trial."  The court found that, as revealed by the footage, S.N. "was under the stress of an excitement" and "tearful" when speaking to Officer Garcia.  The officer arrived "within approximately eight minutes" of the iPhone theft, and although he was not the first officer on the scene, he was the first one who could speak to S.N. in Spanish.  The interview itself was "informal[]," taking place "on a public street where the crime had occurred."  And finally, the theft's perpetrator had not yet been apprehended, and an ambulance was called after S.N. complained of pain.

After the trial court ruled the statement was admissible, the prosecutor asked Officer Garcia whether S.N. "explained to [him] how she came to have [the] pain to her face"—namely "numbness to her upper lip and nose area"— about which the officer had previously testified.  The officer testified that S.N. "stated that she was struck in the face as the subject tried to steal her phone or tried to take her phone from her."

---

[10] Two prosecutors, a man and a woman, tried the case, and we use different pronouns when referring to each.

## 2. Analysis

The Sixth Amendment's confrontation clause gives criminal defendants the right to be confronted with the witnesses against them. (U.S. Const., 6th Amend.; *Samia v. United States* (2023) 599 U.S. 635, 143 S.Ct. 2004, 2009–2010.) "As interpreted by the [United States] Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36," the confrontation clause "prohibits the admission of 'testimonial statements' made by a nontestifying witness unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination." (*People v. Ogaz* (2020) 53 Cal.App.5th 280, 286.) Here, there is no dispute that the exception for unavailable witnesses previously subject to cross-examination was not established. Also, there is no dispute that even if S.N.'s statement was otherwise admissible as a spontaneous statement, that does not permit us to forego the constitutional analysis. (See *People v. Liggins* (2020) 53 Cal.App.5th 55, 64.) Thus, on appeal "the admissibility of [S.N.'s statement] turns on whether it was testimonial," an issue we review de novo. (*Ogaz*, at p. 286; *People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

*Crawford* indicated that " '[s]tatements taken by police officers in the course of interrogations' " generally qualify as testimonial statements. (*Davis v. Washington* (2006) 547 U.S. 813, 822, quoting *Crawford v. Washington*, *supra*, 541 U.S. at p. 52.) But in *Davis*, the Supreme Court explained that not all statements made under questioning by law enforcement officers are testimonial: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency,

and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, at p. 822.)

Bryant, the decision on which the trial court relied, elaborated on "what *Davis* meant by 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.' " (*Bryant, supra*, 562 U.S. at p. 359, quoting *Davis v. Washington, supra*, 547 U.S. at p. 822.) In *Bryant*, police officers responded to a parking lot where they found a gunshot victim who "appeared to be in great pain . . . and spoke with difficulty." (*Bryant*, at p. 349.) The officers asked the victim what had happened, who shot him, and where he was shot. (*Ibid.*) The victim was able to describe the circumstances of the shooting and identify the defendant as the shooter before an ambulance arrived to take him to the hospital, where he later died. (*Ibid.*) *Bryant* held that the statement was nontestimonial, because neither the victim nor the police objectively appeared to have a " 'primary purpose' " of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." (*Id.* at pp. 375–376.) In doing so, the Supreme Court emphasized that while the existence of an ongoing emergency "is among the most important circumstances" to be considered, it is not dispositive of an interrogation's primary purpose. (*Id.* at pp. 366, 370.)

Based on *Bryant*'s analysis, our state Supreme Court has "identified six factors to consider in determining whether statements made in the course of police questioning were for the ' "primary purpose of creating an out-of-court substitute for trial testimony" that implicates the confrontation clause.' [Citation.] These are (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appeared to present an

emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained." (*People v. Chism* (2014) 58 Cal.4th 1266, 1289.)

Herrera argues that S.N.'s statement "was a classic form of testimonial hearsay" because S.N. made it in response to police questioning meant to determine "what happened," not to address an ongoing emergency. Although he acknowledges that S.N. complained of pain and an ambulance was called, he claims that "recent violence and a victim in need of medical treatment does not automatically amount to an 'ongoing' emergency." To support this argument, he primarily relies on *People v. Roberts* (2021) 65 Cal.App.5th 469 (*Roberts*), in which the Sixth District Court of Appeal held that a domestic-violence victim's statement to police was inadmissible under the confrontation clause. (*Id.* at p. 478.)

In *Roberts*, a hotel guest reported hearing a woman screaming from another room. (*Roberts*, *supra*, 65 Cal.App.5th at p. 473.) After the hotel manager contacted the victim, the defendant's girlfriend, she showed him "marks on her back and said [the] defendant had beaten her with a belt." (*Ibid.*) As the manager was calling the police, he saw the defendant approaching, "holding a belt" and "look[ing] mad." (*Ibid.*) By the time the police arrived, however, the defendant was gone. (*Ibid.*) An officer testified that when he spoke to the victim, who did not testify, she looked " 'afraid' and 'a little bit in shock.' " (*Ibid.*) She showed the officer the marks on her back, said she was in pain, and reported that "her boyfriend had whipped her with

32

a belt three or four times. She also revealed that [he] had been violent with her in the past, around 10 times over the past several years." (*Ibid.*)

*Roberts* held that the primary purpose of the officer's questioning of the victim "was to establish the identity of the assailant for use in a later criminal prosecution," not to respond to an ongoing emergency. (*Roberts*, *supra*, 65 Cal.App.5th at p. 478.) The victim was "safe in the office with the hotel manager" when the police arrived, and "[a]s a domestic violence incident, there was 'a narrower zone of potential victims' and a lower likelihood [that the defendant] pos[ed] an ongoing threat to the public at large." (*Ibid.*, quoting *Bryant*, *supra*, 562 U.S. at p. 363.) Thus, the victim's statement that the defendant had struck her with a belt and been violent toward her before should have been excluded, although the appellate court found the error harmless. (*Roberts*, at pp. 478–479.)

Although we agree with Herrera that a victim's complaint of injuries does not automatically establish an ongoing emergency, *Roberts* is distinguishable. In that case, there was no immediate threat to the public, whereas here, there was still a risk of other thefts being committed. Indeed, Officer Garcia indicated at the evidentiary hearing that when he spoke to S.N., the police were "trying to locate the phone" by getting information from her enabling them to track it. Thus, the police were actively trying to find the stolen property and, in turn, the theft's perpetrator. Moreover, *Roberts* did not address other factors relevant to the analysis. Having reviewed body-cam footage of S.N.'s interactions with the police, we agree with the trial court's observations that she was still upset and officers spoke to her under very informal circumstances. In short, viewed objectively, the police's main purpose in talking to her does not appear to have been to collect information for a criminal prosecution.

Even if S.N.'s statement was testimonial, we would conclude that its admission was not prejudicial. Herrera claims that S.N.'s "complaining of injuries impacted the jury's determination of a critical issue at trial"—his intent during the charged crimes—because it "amplified [A.M.'s] prior uncharged misconduct from a theft-from-the-person to an injury-causing event." The evidence that S.N. experienced minor injuries may have tended to prove that A.M. committed robbery, not just theft, but that was unlikely to impact the jury's evaluation of Herrera's later intent. Officer Garcia testified that S.N. had no visible injuries, and there is no other evidence to suggest that Herrera was aware that A.M. hurt her. Although S.N. also stated that A.M. "struck" her, the jury saw video footage of the theft itself, which suggested that the contact was accidental. In any event, robbery does not require a specific intent "to cause the victim to experience force or fear," meaning that whether A.M. used force or fear during the prior incident was not crucial to establishing Herrera knew A.M. intended to rob Sac Ajtzalam. (*Anderson*, *supra*, 51 Cal.4th at p. 995.) In short, S.N.'s statement about being injured proved little about A.M.'s intent or, in turn, Herrera's awareness of that intent. Thus, although we agree with Herrera that the evidence of his mens rea was not overwhelming, any error in the admission of S.N.'s statement was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *Roberts*, *supra*, 65 Cal.App.5th at pp. 478–479.)

D.    *Herrera Is Not Entitled to Relief Based on the Trial Court's Failure to Suppress His Text Messages.*

Herrera claims the trial court erred by admitting text messages between him and his girlfriend, including the "Makin money" text, because a different judge originally suppressed them. We conclude that any error was harmless.

34

1.      Additional facts

Herrera's cell phone was seized after his arrest, and the police obtained a warrant to search the phone's contents. Before trial, Herrera moved to quash and traverse the search warrant and suppress the cell-phone data obtained from the search. He argued that suppression was required under the Fourth Amendment because the warrant was overbroad and lacked probable cause.

After briefing was complete, the motion was heard by Judge Harold Kahn, who signed the warrant. On June 7, 2021, while the trial court was conducting jury selection, Judge Kahn issued a written order granting the motion and suppressing "all items obtained from the warrant." Judge Kahn determined that the affidavit accompanying the warrant supported searching for only (1) data showing Herrera's location on the date of the murder; (2) communications between him and A.M. or Sac Ajtzalam for the two weeks preceding the murder; and (3) photographs of Herrera and A.M. together from 2016. Yet the warrant "contained no limitation as to time or app," meaning it was overbroad and lacked probable cause.

Two days later, on June 9, the police sought another warrant to search Herrera's cell phone, which Judge Christine Van Aken signed. This warrant limited the data to be searched to that between two days before the murder and one day after the murder. Herrera immediately filed a petition to stay execution of the June 9 warrant. He also filed a motion to void the warrant, arguing that the People should have sought appellate review of Judge Kahn's order quashing the original warrant, Judge Van Aken could not overrule that order, and the affidavit supporting the warrant was tainted by illegally obtained evidence. The People responded that they did not seek to challenge Judge Kahn's order, Judge Van Aken did not overrule that order, and the

affidavit supporting the June 9 warrant did not rely on any evidence obtained from the original cell-phone search.

In a written order, Judge Van Aken denied Herrera's requests to stay or void the June 9 warrant. She concluded the warrant did not "amount[] to an improper request for reconsideration" of Judge Kahn's order quashing the original warrant. The new warrant "provided a different statement of probable cause" that, while containing "many" of the same facts, included new information about "a jailhouse phone conversation between [Herrera] and [his girlfriend] which gave rise to a fair inference that [Herrera] had previously used his cell phone to communicate with the associate about his plans with [A.M.] shortly before the crime alleged here."[11] The order found "nothing untoward . . . in the government's request for a new warrant that attempted in good faith to cure the defects of the prior warrant by significantly narrowing its scope . . . [and] provid[ing] additional facts to support probable cause . . . ; candidly informed [her] of the prior warrant and Judge Kahn's order [quashing it]; and did not describe any fruits of the prior, quashed warrant in the probable cause statement." Judge Van Aken did not rule on whether the newly seized cell-phone data "may be used at trial."

Ten days later, Herrera filed another motion to quash the warrant and suppress the evidence derived from it. He argued that the Judge Kahn's order quashing the original warrant was res judicata, it was "obvious" the new warrant was obtained based on illegally obtained cell-phone data, and the warrant lacked particularity and was overbroad.

The trial court orally denied the motion to quash. The court agreed with Judge Van Aken's ruling that "the government's actions in seeking a second warrant" did not "amount[] to an improper request for a

---

[11] The affidavit supporting the June 9 warrant is not in our record.

36

reconsideration of the [June 7] order" quashing the original warrant. The court then held that there was probable cause for the new warrant because it was narrowed by date; the supporting affidavit relied on new evidence, the jailhouse call; and the affidavit "did not contain any evidence obtained from the voided first warrant." Ultimately, a one-page excerpt of the text messages between Herrera and his girlfriend on the night of the murder, including the "Makin money" text, was admitted.

### 2. Analysis

Herrera claims the trial court was required to suppress the text messages based on Judge Kahn's quashing of the original warrant. Alternatively, he claims the new warrant was overbroad. We need not address these contentions because we conclude that any error was harmless.

The Fourth Amendment prohibits unreasonable searches and seizures and requires warrants to be issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.; *People v. Fayed* (2020) 9 Cal.5th 147, 182; *People v. Meza* (2023) 90 Cal.App.5th 520, 534.) "A search is presumptively reasonable, and thus in compliance with the Fourth Amendment, if supported by a [valid] warrant." (*Meza*, at p. 534.) To determine whether a warrant is valid, a court must "examine three main factors: probable cause, particularity[,] and overbreadth." (*Id.* at p. 535.) Probable cause involves whether there is " ' "a substantial basis for concluding a fair probability exist[s] that a search would uncover wrongdoing" ' "; particularity involves whether the warrant " 'clearly state[s] what is sought' "; and overbreadth involves whether " 'the scope of the warrant [is] limited by the probable cause on which the warrant is based.' " (*Ibid.*)

37

We independently review whether a search or seizure violated the Fourth Amendment. (*People v. Meza, supra*, 90 Cal.App.5th at p. 536.) If "an error is of constitutional dimension, we excuse it as harmless only if we are persuaded beyond a reasonable doubt that it did not contribute to the guilty verdicts." (*People v. Meza* (2018) 23 Cal.App.5th 604, 612; *Chapman v. California, supra*, 386 U.S. at p. 24.)

Herrera argues that the admission of the text messages was prejudicial under this standard because they "may have influenced at least one juror to find that [his] purpose in accompanying [A.M.] was criminally motivated." The Attorney General responds that Herrera also mentioned the "Makin money" text during the jailhouse call, meaning the text itself "held little independent evidentiary value."

The Attorney General has the better argument. Herrera specifically stated during that call that he had told his girlfriend "we're gonna go make money" before the crimes occurred. He does not explain how the text itself conveyed any damaging information beyond that in the call, whose admission he does not challenge. Moreover, during the call he denied any intent to "hit a lick" with A.M., and during his testimony he gave an innocent explanation for the "Makin money" text—that he was referring to selling marijuana, not robbery. Thus, other evidence weighed against interpreting the text to mean that Herrera intended to help A.M. commit robbery. In light of the evidence as a whole, we are persuaded beyond a reasonable doubt that Herrera would not have obtained a better result had the text messages been suppressed.

> E.    *Herrera Forfeited His Claim Involving the Trial Court's Responses to Two Jury Questions.*

Next, Herrera contends that the trial court inadequately addressed the jury's questions about the intent required to (1) find he aided and abetted robbery and (2) convict him of felony murder. He argues the court's answers

38

allowed the jury to convict even if it did not find that he intended to aid A.M. in committing robbery, reducing the prosecution's burden of proof. We conclude this claim is forfeited.

### 1. Additional facts

The jury was instructed under CALCRIM No. 401 that to establish Herrera was guilty of a crime as an aider and abettor, the People had to prove: (1) "[t]he perpetrator committed the crime"; (2) "[t]he defendant knew that the perpetrator intended to commit the crime"; (3) "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime"; and (4) "[t]he defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." The instruction further provided that "[s]omeone aids and abets a crime if [the person] knows of the perpetrator's unlawful purpose and [the person] specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

The jury was also instructed under CALCRIM 540A that to establish Herrera was guilty of felony murder, the People had to prove: (1) he "attempted to commit robbery"; (2) he "intended to commit robbery"; and (3) "[w]hile attempting to commit robbery [he] caused the death of another person." The instruction provided that Herrera must "have intended to commit the felony of robbery before or at the time that he caused the death," and it directed the jury that to determine whether he "attempted to commit robbery," it must apply "the separate instructions . . . given . . . on that crime."

During deliberations, the jury submitted the following note to the trial court: "For part 3 of 401, should we interpret it as the defendant: [¶] – did an action that aided in the crime and [¶] – intended to do the action [¶] OR [¶]

39

– intended to commit the crime." When it met with the parties to discuss the matter, the court stated it was unsure what the question meant and wanted clarification from the jury before answering.

Herrera's trial counsel urged the trial court to answer the question without further input from the jury, because she believed it was sufficiently clear the jury was "asking is it enough that the person intended to do the action that aids and abets the crime even if they don't intend to aid and abet the crime? And the answer clearly is no, aiding and abetting is specific intent." Counsel suggested that the language in CALCRIM No. 401 following the four elements of aiding and abetting—that someone aids and abets a crime if the person knows of the perpetrator's unlawful purpose and "specifically intends to . . . aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime"—was "a clear answer to [the jury's] question of whether aiding and abetting is a general or specific intent crime." Counsel continued, "The Court could also state clearly . . . [that a]iding and abetting requires specific intent and refer to the jury instruction that notes as much and then quote this paragraph and then state that the jury should let the Court know if it has further questions and to be as specific as possible."

The prosecutor responded that the jury's question was confusing because while it referred to CALCRIM No. 401's third element—that "the defendant intended to aid and abet the perpetrator in committing the crime"—it "seem[ed] to use the language" of the portion of the instruction that defense counsel thought answered the question. He agreed the court should talk to the jury.

The following day, the trial court asked the jury foreperson to clarify the question. Referring to CALCRIM No. 401's enumerated elements, the juror stated, "Number three says if an act was intentional, number four

40

[says] . . . was the act effective [at] aiding the crime[,] and the question was what if an act was intentionally performed that had the effect of aiding the crime, but . . . the [defendant's] intent of the act was not to abet[] the crime, is that still aiding and abetting?" The court responded, "Your question is whether or not a person has to have intent to commit the crime?," and the juror said, "Whether the intent of the act was to aid the crime even if it had the effect of aiding the crime."

Another juror tried to clarify further. This juror said, "I think the question in number three is did he have the intent to commit the crime? If he didn't have the intent to commit the crime, but it did have the effect, I think perhaps we were also questioning if he had the intent to help the—there's an intent to help [the direct perpetrator] in another way. The intent was to aid but not . . . necessarily aid in the crime." The foreperson then restated the question as follows: "[D]oes any intentional act count or . . . do you . . . have to have the explicit intent to aid and abet that certain crime?"

The trial court and the parties discussed the matter off the record. When they returned, the court instructed the jury as follows: "I'm going to refer you back to 401. I'm going to refer you to the paragraph which I believe addresses your question[,] that is the paragraph under Element 4 which states, someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, the perpetrator's commission of that crime."

Two days later, the jury submitted the second note at issue. The note read: "We understand that someone guilty of aiding and abetting a robbery is guilty of that robbery. [¶] If a person intended to aid and abet robbery, are they intending to commit robbery by definition? We are specifically referring

41

to 540A bullet point 2." The prosecutor argued that the answer was yes. Defense counsel disagreed, stating that a person who aided and abetted a crime does not "by definition share the perpetrator's intent." She argued that "[a]n affirmative answer to this question would be collapsing them into one mental state." Counsel proposed that the trial court "clarify that 401's aiding and abetting liability applies to the attempted robbery charge" and ask the jurors, "with that in mind," to "clarify their question as much as possible if it in fact is a question they still have. [¶] The Court could, of course, point them to Instructions 401, 460, and 1600, in addition to the one they mention, which is 540A."

After additional discussion, defense counsel affirmed that she was requesting that the trial court answer, "You must find all of the elements in Instructions 401, 540A, 460, and 1600." The court's written response to the jury's note was identical to what counsel proposed, except that it added "Jury" in front of the word "Instructions."

> 2.      Herrera's claim is forfeited.

The Attorney General argues that Herrera forfeited this claim because his trial counsel "actively advocated" for the responses the trial court ultimately gave. We agree.

When a defendant's attorney agrees to a trial court's response to a jury's question, the defendant forfeits any claim that the response was incorrect. (*People v. Rogers* (2006) 39 Cal.4th 826, 877; *People v. Loza* (2012) 207 Cal.App.4th 332, 350.) Here, in discussing the first jury note, defense counsel argued that the language in CALCRIM No. 401 following the fourth element of aiding and abetting provided "a clear answer to [the jury's] question of whether aiding and abetting is a general or specific intent crime." The trial court's response referred the jury to that language. And the court's

42

response to the second jury note was essentially identical to what defense counsel requested. Thus, Herrera cannot now complain about the court's responses.

Herrera does not challenge the conclusion that defense counsel agreed to the trial court's response to the first jury note. As to the second note, however, he argues that the court's response "was not the product of an agreement" between the trial court and the parties. But defense counsel affirmed she wanted the court to give the answer it ultimately gave. We disagree that this was simply "damage control" after the court did not follow her initial suggestion to inquire of the jury further.

Herrera also claims that forfeiture does not "apply to the instant issue, where law imposes on the trial court a duty to instruct." We do not follow this argument. Certainly, the court had the duty to instruct on aiding and abetting, felony murder, and related principles, and we agree with Herrera that courts have "a general obligation to 'clear up any instructional confusion expressed by the jury.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 802.) But the fact that a court has a duty to do something does not excuse a defendant from objecting if that duty is violated. Here, defense counsel not only did not object to the court's responses, she advocated for them.

Finally, Herrera asks us to reach the merits under section 1259, which permits an appellate court to evaluate a forfeited issue if it " 'affected the substantial rights of the defendant.' " We decline to exercise our discretion under that statute to consider his claim. (See *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1525.)

*F.*     *The Manner in Which the Jury Viewed the Surveillance Videos During Deliberations Was Not Misconduct.*

Herrera claims he is entitled to a new trial because the jury used a computer to "manipulate" the surveillance videos, "essentially creating new evidence" that he was unable to address.  The claim fails.

1.     Additional facts

When the surveillance footage from the liquor store at 21st and South Van Ness was played for the jury, the prosecution sought to have the police officer who downloaded it "zoom in on an area."  Herrera's objection to this was overruled, but the officer was unable to make the zoom function work.

Subsequently, the trial court asked what other video manipulations the People intended to offer.  The prosecutor responded that they wanted "to have a witness come in and demonstrate for the jury how to use the players . . . , not only to zoom in to a particular portion of what's being displayed on the screen, but also to adjust the lighting of the images in order to increase the details."

Herrera's trial counsel responded that no such witness had been disclosed, at which point the trial court indicated it did not believe expert testimony was required "to show the jury how to use the functions."  Counsel then argued that the defense had no notice the prosecution was going to "manipulate these videos in all sorts of ways" and that zooming in on or lightening the video footage "does change the image."  Counsel stated that although a layperson might be able to perform these functions, an expert was required to establish whether they changed the evidence.  If the parties did not know whether the evidence was being "distort[ed] in some way," then allowing the jury to manipulate the videos was "inviting a lot of trouble."

The prosecutor argued that allowing the jury to zoom in on or lighten the videos on the laptop it would have during deliberations would do nothing

44

to alter the digital files. She also noted the jury would not be given any "new image[s]," such as a permanently lightened still. The trial court agreed that zooming or lightening did not distort the videos, although Herrera could call a witness to establish otherwise if he wished.

Defense counsel then argued that even if the prosecution could zoom in on or lighten the videos while they were played in court, the jury "should not be given the ability to manipulate [them]" during deliberations. Counsel was concerned that jury might manipulate the videos in other ways the parties did not contemplate, given the jurors' potential "technological expertise." The prosecutor agreed that any functions other than what was presented in court "should be turned off" if possible. The trial court reserved ruling on the issue.

Subsequently, an IT specialist with the District Attorney's Office testified about four video clips that he zoomed into and/or lightened. He also copied three of the clips, shrunk them, and spliced them together in a new file so they could be viewed at the same time. The jury was shown the original clips, four zoomed-in clips, three lightened clips, three zoomed-and-lightened clips, and the spliced file.

While discussing these exhibits' admission, Herrera's trial counsel reiterated her understanding that "the surveillance videos . . . [would be] submitted in a format [in which] they could not be manipulated in the jury room." The prosecutor responded that "that is a player issue, not a file issue," and she had "already instructed IT" to remove a second video player from the jury's laptop that gave other "options" for manipulation. Before deliberations, the jury was instructed under CALCRIM No. 200 that it had "to decide what happened, based only on the evidence that has been presented," and under CALCRIM No. 201 that it could not "conduct any tests or experiments."

45

After the verdicts, Herrera moved for a new trial on several grounds, including jury misconduct based on "manipulat[ing] video to create new evidence." He submitted declarations from five jurors that described how they watched the 21st Street surveillance videos. One juror, S.C., stated that "[t]he jury watched these videos at least 50 times during deliberations, in regular speed and . . . a few times in slow motion." Another juror, C.S., stated that the jurors watched the videos "ad nauseum." According to her, the jury was initially "not able to watch the videos in slow motion, but then one of the jurors figured out how to do so."

Juror J.T. stated that the jury "watched these videos repeatedly, after overlaying and sequencing them together so that they played in a loop." According to juror M.H., "[o]ne juror was able to set up a few of the videos to play chronologically, in succession, without stopping in between. To [his] knowledge and recollection, each video was played in its entirety, without editing or splicing." S.C. also said the jury "watched the videos looped together," although she was unsure whether another juror "looped them together or they . . . already [were] like that."

All but one of these five jurors stated that the surveillance videos "were critical to the verdicts." S.C. declared that when viewed during deliberations, the videos showed something "completely different than what [the jury] saw in the courtroom." She stated that before watching the videos, she had "expected [her] verdict to be not guilty."

The prosecution did not submit any evidence in opposing the motion for a new trial, and no live testimony was presented at the hearing on the motion. At that hearing, Herrera's trial counsel argued that the jury's manner of watching the surveillance videos amounted to "chang[ing] the character of the exhibit," and "[t]his 'completely different' evidence

46

necessarily went unconfronted" by the defense. The prosecutor responded that neither slowing down the videos nor looping them amounted to altering the evidence, as the exhibits remained "exactly the same." The jurors were able to see the videos better during deliberations than during trial because they could get closer to the screen, but that was "fair."

The trial court denied the motion for a new trial. The court determined that "the looping and slowing down of the videos" did not amount to "an illicit experiment which created new evidence." Rather, the jury "examined . . . the evidence in a detail[ed] and rigorous manner" and did not "[go] beyond the evidence admitted."

### 2. Analysis

Herrera claims the jury's viewing of the surveillance videos constituted "improper experimentation," requiring a new trial. We disagree.

In a criminal case, a new trial may be granted on the grounds that "the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property," or that the jury engaged in "misconduct by which a fair and due consideration of the case has been prevented." (§ 1181, subds. (2) & (3).) It is jury misconduct to perform "an experiment that results in the acquisition of new evidence," but it is not misconduct to perform "a 'more critical examination' of the evidence admitted." (*People v. Collins* (2010) 49 Cal.4th 175, 244 (*Collins*).)

We review de novo the denial of a motion for a new trial based on jury misconduct. (*People v. Gamache* (2010) 48 Cal.4th 347, 396.) In doing so, we " ' "accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*Ibid.*) The question whether "those facts constitute misconduct . . . [is] a legal question we review independently." (*Collins*, *supra*, 49 Cal.4th at p. 242.)

47

"Courts evaluate a motion for a new trial based on jury misconduct in three steps: (1) determine what evidence is admissible; (2) if there is admissible evidence, decide if it establishes misconduct; and (3) if there is misconduct, determine whether it was prejudicial." (*People v. Flores* (2021) 70 Cal.App.5th 100, 107 (*Flores*).) Here, we need not address the parties' dispute about which portions of the juror declarations were admissible under Evidence Code section 1150, which bars evidence of a juror's reasoning process. The trial court did not clearly exclude any statements under this statute, and Herrera's claim fails even if we assume that the declarations were admissible in whole.

As our state Supreme Court has explained, "Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined at trial." (*Collins*, *supra*, 49 Cal.4th at p. 249.) The jury may, however, "weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*Ibid.*)

In *Collins*, a juror "used his computer to create a model that allowed him to determine, under his interpretation of the evidence, the relative positions of the shooter and the [murder] victim." (*Collins*, *supra*, 49 Cal.4th at p. 252.) The manner in which the victim was shot was relevant to determining whether the defendant should receive the death penalty. (*Id.* at p. 251.) The Supreme Court held that the juror had not committed misconduct because the diagram he created reflected evidence from the trial,

48

including the victim's height, the defendant's height, and the angle of the bullet's trajectory to which an expert had testified. (*Id.* at pp. 252–253.) Thus, the diagram "did not interject any information outside the record." (*Id.* at p. 253.) Nor was there any "showing that the computer or its software performed any analytical function or provided any outside information," meaning the juror could have created a similar diagram by hand. (*Id.* at p. 255.) Thus, the computer "was simply the device that allowed [him] to draw his diagram with ease and accuracy in order to visualize the evidence." (*Ibid.*)

*Collins* "caution[ed] that a computer may be misused to *investigate* the evidence," citing numerous cases in which jurors searched the Internet for information. (*Collins*, *supra*, 49 Cal.4th at pp. 255–256.) The Supreme Court also observed that if a juror performed an investigation "rel[ying] on software that manipulates the data, subjecting it to presumptions written into the program, such use would likely constitute an improper experiment." (*Id.* at p. 256.) This would be akin to other situations in which jurors improperly used tools, such as binoculars, to "create[] extraneous evidence not admitted at trial." (*Ibid.*; see *People v. Castro* (1986) 184 Cal.App.3d 849, 852.)

Herrera argues that this case presents an example of the type of computer misuse *Collins* warned against. He claims the jury used "software that manipulated the data[,] rais[ing] questions about that software's presumptions." But the jurors' declarations do not describe any use of the computer that "manipulated the data" or otherwise injected new evidence into the proceedings.

To begin with, viewing the videos in slow motion allowed the jurors to better "scrutinize" them (*Collins*, *supra*, 49 Cal.4th at p. 249), but it did not alter the evidence. Herrera does not argue otherwise. Rather, he

concentrates on the jurors' descriptions of watching videos "after they had been overlaid, sequenced, and looped." (Boldface and italics omitted.) But it is unclear from these descriptions what the jurors actually did. Although it appears they viewed multiple clips simultaneously or back-to-back, there is no suggestion those clips were altered in any way. Indeed, one juror stated that the jury did not perform any "editing or splicing." Herrera fails to explain what evidence outside the record could have been created by playing the videos at different speeds or in conjunction with one another. He has not demonstrated jury misconduct.

G. *Herrera's Claim of Jury Misconduct Based on the Leniency Note Lacks Merit.*

Herrera claims the jury also committed prejudicial misconduct by considering punishment and trading votes. We are not persuaded.

1. Additional facts

The jury was instructed under CALCRIM No. 3550 that it "must reach [its] verdict without any consideration of punishment." Nonetheless, when returning the verdicts, the jury also delivered a handwritten note signed by eight jurors that stated, "We urge leniency." When the jury was polled, each juror affirmed the verdicts.

Herrera's motion for a new trial also relied on jury misconduct involving the leniency note. As noted above, juror S.C. averred that she "expected [her] verdict to be not guilty before watching the videos . . . during deliberations." She continued, "I was the last juror to vote guilty. I refused to do so unless the other jurors agreed we could sign a 'we urge leniency' note, which we ultimately did. I told the other jurors this was the only way I could vote guilty." And juror C.S. stated in her declaration that "[t]he topic of various sentences carried by differen[t] charges (e.g. manslaughter) was

50

discussed during jury deliberations, in relation to defendant Omar Herrera's age, and that he would spend his adult years in prison."

At the hearing on the new-trial motion, the parties' arguments about the leniency note focused on *Flores*, *supra*, 70 Cal.App.5th 100, in which the Third District Court of Appeal reversed based on jury misconduct in discussing punishment. Rejecting Herrera's claim of jury misconduct based on the note, the trial court observed that "the objective of the misconduct" in *Flores* was to punish the defendant, whereas the jurors here wanted "to make sure that Mr. Herrera was not punished too much." The court found this to be "a crucial distinction for inquiry into whether Mr. Herrera was prejudiced." After stating that S.C.'s "deliberative process" was not a "proper consideration," the court opined that "[t]he real question" was "whether [S.C.] based her vote on the evidence." The court determined that "she did[,] according to her declaration, and . . . certainly the record substantiates that was, in fact the case." Finally, the court found that "the record [did not] suggest[] any vote trading."

### 2. Analysis

We apply the same independent standard of review to this claim of jury misconduct as we did to the claim involving manipulation of the video evidence. As with the prior claim, we need not address the parties' disputes involving Evidence Code section 1150. Even if we assume that S.C.'s and C.S.'s declarations are admissible in full, the record fails to establish the jury engaged in prejudicial misconduct.

To begin with, the Attorney General does not dispute that the evidence shows "jury misconduct in the form of impermissible consideration of punishment while deliberating on guilt." "[I]t is settled that punishment should not enter into the jury's deliberations" in non-capital cases. (*People v.*

*Engelman* (2002) 28 Cal.4th 436, 442.) The rationale for this rule is that " 'knowledge of the permitted or statutorily required punishment may cause or influence the jury to return a verdict designed to result in particular penalty, rather than one based on the facts and applicable law of a case.' " (*Flores*, *supra*, 70 Cal.App.5th at p. 110.) Violating a trial court's instructions also constitutes misconduct. (*People v. Lavender* (2014) 60 Cal.4th 679, 687.) Here, S.C.'s and C.S.'s declarations and the leniency note itself leave no doubt that jurors improperly considered punishment during deliberations.

Herrera claims that jury misconduct also occurred in that S.C. "traded her vote for a note requesting leniency," violating his right to a unanimous jury. But the trial court found that S.C. "based her vote on the evidence," and we conclude that substantial evidence supports this finding. S.C.'s statement that she expected to vote not guilty before the jury closely reviewed the videos—which, as we discussed above, was not misconduct—is reasonably interpreted to mean that once she rewatched the videos, she decided that Herrera *was* guilty. As the Attorney General argues, "[h]ad it been otherwise, no request for leniency would have been necessary because . . . a hung jury would have resulted. It was *only* because the jury convicted based on the strength of the People's evidence that the leniency note served a purpose." The jurors' affirmance of the verdicts when polled further supports the conclusion that the verdicts were unanimous. Thus, while S.C.'s refusal to vote guilty unless other jurors signed the leniency note was improper to the extent it involved consideration of punishment, Herrera fails to demonstrate that it constituted misconduct for any other reason.

We therefore turn to whether the jurors' consideration of punishment was prejudicial. (See *Flores*, *supra*, 70 Cal.App.5th at p. 107.) When jury misconduct is established, it creates "a presumption of prejudice, which may

be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct." (*People v. Lavender*, *supra*, 60 Cal.4th at p. 687.)

In arguing that the misconduct was prejudicial, Herrera attempts to analogize this case to *Flores*. There, the jury was at an impasse between murder and voluntary manslaughter until jurors discussed the possibility that the defendant would go free if they could not return a verdict. (*Flores*, *supra*, 70 Cal.App.5th at p. 103.) Shortly after this discussion, the jury found the defendant guilty of voluntary manslaughter. (*Ibid.*) *Flores* held that the jury's discussion of punishment was sufficiently prejudicial. (*Id.* at p. 114.) Even though the jury convicted the defendant of the lesser crime, " 'in the context of prejudice, a mistrial is a better outcome than a conviction.' " (*Ibid.*) Given that the jury was unable to agree on a verdict until it considered punishment, there was a reasonable probability that the misconduct actually harmed the defendant. (*Ibid.*)

Here, in contrast, the jury's concern was that Herrera not be punished too harshly, not that he might escape punishment. But despite this mitigating concern, the jury chose to convict him of all the charged counts and enhancements. Clearly, the leniency note itself did not harm Herrera. Thus, the only possible theory for how Herrera could have obtained a better result had the jury not discussed punishment was if S.C. voted to acquit because she did not obtain other jurors' agreement to send the note. But in light of the fact that S.C. believed Herrera was guilty based on the evidence, it is speculative to conclude that she would have nonetheless voted to acquit had punishment not been discussed. And as the Attorney General points out, if the jury hung because S.C. voted to acquit despite her view of the evidence,

that outcome would also be the product of misconduct.  In short, there is no reasonable probability that the jury misconduct harmed Herrera.

H.	*There Was No Cumulative Error.*

Herrera claims that the evidentiary and instructional errors and video-related jury misconduct he identifies were cumulatively prejudicial, even if they do not individually require reversal of the murder and attempted-robbery convictions.  We are again not persuaded.

" '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  We have concluded that no error occurred in the admission of evidence of the iPhone theft, the admission of S.N.'s statement, and the jurors' viewing of the surveillance videos, and Herrera forfeited his claim that the trial court improperly responded to the jury's questions.  Although we have assumed that the "Makin money" text should not have been admitted, this evidence was of relatively minor significance.  Thus, even considered cumulatively, the prejudice resulting from these errors does not require reversal under any standard.

I.	*Herrera's* Bruen *Claim Fails.*

Finally, Herrera claims that section 25850, the statute under which he was convicted of unlawfully carrying a firearm, is unconstitutional under *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*).  He is incorrect.

Section 25850, subdivision (a), makes it a crime for a person to "carr[y] a loaded firearm . . . on the person or in a vehicle while in any public place or on any public street in an incorporated city, city and county, or in any public place or on any public street in a prohibited area of an unincorporated area of

a county or city and county." If the person "is not listed with the Department of Justice pursuant to Section 11106 as the recorded owner of the handgun," the crime is a felony. (§ 25850, subd. (c)(6).) Section 25850 does not apply to anyone licensed to carry a concealed handgun. (§ 26010; *People v. Mosqueda* (2023) 97 Cal.App.5th 399, 405 (*Mosqueda*); see §§ 26150, 26155.)

In *Bruen*, the United States Supreme Court held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." (*Bruen, supra*, 597 U.S. at p. 10.) This right is "subject to certain reasonable, well-defined restrictions." (*Id.* at p. 70.) To determine whether government regulation of handgun possession passes constitutional muster, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." (*Id.* at p. 17.) If it does, "the Constitution presumptively protects that conduct," and "[t]o justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." (*Ibid.*)

Applying this test, *Bruen* held that part of New York's handgun licensing scheme violated the constitutional right to carry a handgun in public for self-defense. (*Bruen, supra*, 597 U.S. at pp. 32–34, 71.) New York law required a person seeking a license to carry a concealed handgun in public to show "proper cause," requiring a showing of " 'a special need for self-protection distinguishable from that of the general community.' " (*Id.* at p. 12.) The Supreme Court concluded that New York failed to demonstrate that the proper-cause requirement was consistent with historical tradition, because most American jurisdictions had not either "broadly prohibited the public carry of commonly used firearms for personal defense" or "required

law-abiding, responsible citizens to 'demonstrate a special need for self-protection . . .' in order to carry arms in public." (*Id.* at p. 70.)

Before *Bruen*, California required applicants for a license to carry a concealed handgun in public to demonstrate "good cause." (Former §§ 26150, subd. (a)(2), 26155, subd. (a)(2); *Mosqueda, supra,* 97 Cal.App.5th at p. 402.) *Bruen* "made clear that California's . . . 'good cause' requirement," which was similar to New York's "proper cause" requirement, "was unconstitutional." (*Mosqueda,* at p. 408, citing *Bruen, supra,* 597 U.S. at p. 15 & fn. 2.)  Thus, "[o]n June 24, 2022, the day after *Bruen* was released, the California Attorney General issued a legal alert recognizing that the good cause requirement in sections 26150 and 26155 was no longer constitutional . . . [and] instruct[ing] local officials not to require proof of good cause for issuing a public-carry license effective immediately." (*Mosqueda,* at p. 408.) Sections 26150 and 26155 were later amended to remove the good-cause requirement.  (Stats. 2023, ch. 249, §§ 10–11.)

Herrera claims that section 25850 was facially unconstitutional at the time he was convicted because of the good-cause licensing requirement.  " 'A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual.' " (*In re D.L.* (2023) 93 Cal.App.5th 144, 157 (*D.L.*).)  Thus, to prevail, Herrera must demonstrate that " ' "no set of circumstances exists under which [the challenged statute] would be valid," *i.e.,* that the law is unconstitutional in all its applications.' " (*Ibid.*)  Whether a statute is facially unconstitutional is a question of law reviewed de novo. (*Id.* at p. 156.)

Initially, the Attorney General argues that Herrera lacks standing to raise this claim.  The Attorney General argues this is so because Herrera

"cannot establish that he was injured by the existence of any unconstitutional good cause requirement," which would require him to show that "he would have been issued a license under the remaining licensing requirements." But as the Attorney General acknowledges, the Sixth District Court of Appeal and our colleagues in Division Two have rejected this argument. (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 912–913; *D.L.*, *supra*, 93 Cal.App.5th at pp. 158–161.) In both cases, the appellate court held that a juvenile who violated section 25850 had standing to assert a facial challenge to that statute, even though the juvenile had not sought, and categorically could not obtain, a license to carry a concealed handgun. (*T.F.-G.*, at pp. 912–913; *D.L.*, at p. 161.) The Attorney General offers us no reason to depart from these decisions' reasoning, which we conclude is sound.

Since Herrera has standing, we turn to address the merits of his constitutional challenge to section 25850. There is no dispute that the good-cause requirement, since legislated out of existence, was unconstitutional under *Bruen*. But other decisions have uniformly rejected the contention that California's licensing scheme as a whole was unconstitutional based on the good-cause requirement, instead concluding that the requirement was severable. (*Mosqueda, supra*, 97 Cal.App.5th at pp. 408–409; *In re T.F.-G.*, *supra*, 94 Cal.App.5th at p. 916; *D.L., supra*, 93 Cal.App.5th at pp. 163–164.) Although Herrera's argument is somewhat hard to follow, he does not clearly claim otherwise, mentioning the concept of severability only in passing.

Rather, Herrera's main argument appears to be that even if California's licensing scheme is otherwise constitutional, section 25850's "blanket prohibition on carrying firearms" is not. To support this point, Herrera primarily relies not on *Bruen* but *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*). In *Heller*, the Supreme Court recognized a

constitutional right to possess handguns in the home and struck down the District of Columbia's blanket ban on handguns. (*Heller*, at p. 635; *D.L.*, *supra*, 93 Cal.App.5th at p. 150.) In doing so, "*Heller* reaffirmed the constitutionality of limitations on the right to keep and bear arms, . . . identif[ying] a nonexhaustive list of 'presumptively lawful regulatory measures,' including 'longstanding' prohibitions on the possession of firearms by felons and the mentally ill, the carrying of firearms in 'sensitive places' such as schools and government buildings, and laws 'imposing conditions and qualifications on the commercial sale of arms.' " (*D.L.*, at p. 151, quoting *Heller*, at pp. 626–627 & fn. 26.)

Seizing on *Heller*'s discussion of presumptively valid limitations, Herrera claims that his conviction under section 25850 must be reversed because it was not alleged that he was a felon or that he carried the firearm in "a particularly sensitive place." We agree with the Attorney General that this argument " 'could only make sense in the context of an "as applied" challenge' " to section 25850, not the facial challenge Herrera raises. (Quoting *D.L.*, *supra*, 93 Cal.App.5th at p. 165.) As we have said, a statute is facially unconstitutional only if it would not be valid under *any* circumstances. (*D.L.*, at p. 157.) Because Herrera fails to identify such an infirmity in section 25850, we must reject his claim.

III.
DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Banke, J.



_____

Langhorne-Wilson, J.



*People v. Herrera*  A165248

Trial Court: City and County of San Francisco Superior Court

Trial Judge: Hon. Teresa M. Caffese

Counsel:

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Alice B. Lustre, Supervising Deputy Attorney General, J. Michael Chamberlain, Deputy Attorney General, for Plaintiff and Respondent.

Dirck Newbury, under appointment by the Court of Appeal, for Defendant and Appellant.

*People v. Herrera*  A165248